**UNSEALED**
**PER ORDER**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON TEXAS**



United States Courts
Southern District of Texas
FILED

DEC 0 8 2010

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | **CRIMINAL NO. H-10-787-S** |
| | § | |
| JONATHAN PAUL BARNES (1), | § | **UNDER SEAL** |
| ~~[REDACTED]~~ | § | |
| | § | |
| BERNARD LANGLEY (4), | § | **Sealed** |
| | § | Public and unofficial staff access |
| ~~CLYDE MELTZER (6) and~~ | § | to this instrument are prohibited by court order. |
| | § | |

## SUPERSEDING INDICTMENT

### COUNT ONE
#### (Conspiracy to Commit Mail and Wire Fraud )

A. INTRODUCTION

At all times material to this indictment:

1.    *Houston Refining LP (Houston Refining)* operated one of the largest

refineries in the Houston area.  Houston Refining was owned by Lyondell Chemical

Co. (Lyondell), which became part of LyondellBasell Industries in December 2007.

Lyondell maintained the headquarters of its United States operations in Houston and

employed thousands in the Houston area.

2.     Houston Refining purchased the majority of the crude oil used at its refinery from Venezuela.  The cost of shipping this crude oil from Venezuela to Houston was a significant expense.

3.     The price to ship crude oil is tied to published market rates.  Three factors are used in computing the shipping price: a) the amount of crude oil, which is typically 70,000 metric tons; b) the World Scale Base Rate, which is set annually, remains constant throughout the year, and is based on factors such as size of the vessel, starting location, and delivery point; and c) the market rate, which is the only factor that fluctuates throughout the year.  While the market rate fluctuates, industry groups such as the Association of Ship Brokers and Agents (ASBA) publish market prices on a weekly basis.  Major oil importers like Houston Refining typically enter into arrangements that base a significant portion of the shipping cost of their crude oil on the published market rate at the time of the shipping.  As a result, annual shipping costs usually closely track the published rates.

4.     JONATHAN PAUL BARNES was the Marine Chartering Manager for Houston Refining from late 2006 through early 2010.  The Marine Chartering Manager negotiates the terms for the shipment of oil from Venezuela to the Houston refinery.

5. 

6.    BERNARD LANGLEY and CLYDE MELTZER were business associates who had worked together at multiple companies in the international energy trading industry, many of which maintained offices in Zug, Switzerland. They also controlled the following companies:

    a.    Fossil Energy Resources, Ltd. (Fossil), incorporated in the British Virgin Islands, which maintained a bank account at UBS in Switzerland and claimed the same office address in Zug, Switzerland, as another company with which LANGLEY and MELTZER were associated.

    b.    Camac Energy Resources, Ltd. (Camac), incorporated in another "offshore" jurisdiction, which maintained bank accounts at UBS in Switzerland and BNP Paribas in France. Camac Energy Resources, Ltd. is a variation of the name of another Camac company doing business in Houston, with which MELTZER and LANGLEY were associated.

## B.   THE CONSPIRACY AND ITS OBJECT

7.   From in or about November 2006 and continuing until in or about January 2010, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

### JONATHAN PAUL BARNES,



### BERNARD LANGLEY,

### CLYDE MELTZER, and

did knowingly combine, conspire, confederate and agree with each other and with others known and unknown to the Grand Jury to commit the following offenses:

(a)  to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and causing to be delivered mail by the United States Postal Service and any private or commercial interstate carrier, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1341; and

4

(b)  to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343.

C.     MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that:

8.  MELTZER and LANGLEY would and did represent to Houston Refining that Camac and Fossil arranged shipping at arms-length market rates, when in fact the two companies played no legitimate role; Camac and Fossil were injected into the shipping process solely to allow them to charge Houston Refining inflated shipping rates and to pay kickbacks to BARNES.

9.





10. BARNES, ███████████████, LANGLEY, ██████████ MELTZER and ████████ would and did create shipping contracts between Houston Refining and Camac, Fossil and ████████████ that contained fixed prices significantly above the published market rates and caused Houston Refining to pay approximately $80 million above market rates during BARNES's tenure as Marine Chartering Manager.

11. After receiving the grossly inflated international and interstate wire transfers from Houston Refining based on the pricing terms BARNES approved, ██████████████████ LANGLEY███████████ MELTZER, and ████████ would and did cause Camac, Fossil and ████████████ to pay a shipping broker to arrange the actual shipping of crude at rates much closer to the lower, published market prices. Prior to and after BARNES's tenure as Marine Chartering Manager, Houston Refining contracted directly with these shipping brokers without the unnecessary step and expense in the process that the conspirators' use of Camac, Fossil and ████ ████ created.

12. In exchange for the entities they controlled receiving tens of millions of dollars above market rates, ████████████████, LANGLEY, ████████████ MELTZER and ████████ would and did pay BARNES millions of dollars in kickbacks using international and interstate wire transfers, payments which the conspirators concealed from Houston Refining.

13. After new management at Houston Refining began scrutinizing the shipping charges in late 2009, BARNES would and did quickly enter into contracts with Fossil and ███████ which provided for payment at rates close to the published market rates.

D.    OVERT ACTS

14. In furtherance of the conspiracy, and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Southern District of Texas and elsewhere:

a.    On or about January 30, 2007, BARNES, LANGLEY and MELTZER caused Houston Refining to wire $1,197,739, which was calculated using a multiplier of 2.25 when the published market rate was 1.56, to a Camac account at BNP Paribas in France.

b.    On or about May 3, 2007, BARNES, LANGLEY and MELTZER caused Houston Refining to wire $1,128,152, which was calculated using a multiplier of 1.95 when the published market rate was 1.38, to a Fossil account at UBS in Switzerland.

c.    On or about May 3, 2007, BARNES, LANGLEY and MELTZER caused a $773,213 wire transfer to be sent from the Fossil account at UBS in Switzerland to American Title to fund BARNES's purchase of a home in Bellaire, Texas.

d.    On or about May 21, 2007, BARNES, LANGLEY and MELTZER caused a $105,831.04 wire transfer to be sent from the Fossil Energy account at UBS

in Switzerland to a Mercedes dealership in Houston to fund BARNES's purchase of a car.

e. On or about September 12, 2007, BARNES, LANGLEY and MELTZER caused Houston Refining to wire $1,154,056, which was calculated using a multiplier of 2.1 when the published market rate was 0.99, to a Camac account at BNP Paribas in France.

f. On or about September 21, 2007, BARNES, LANGLEY and MELTZER caused a $168,789.81 wire transfer to be sent from the Dulson Investment account at UBS in Switzerland to a Mercedes dealership in Houston to fund BARNES's purchase of a car.

g. On or about December 18, 2007, BARNES, LANGLEY and MELTZER caused Houston Refining to wire $1,014,288.89, which was calculated using a multiplier of 2.15 when the published market rate was 1.25, to a Fossil Energy account at UBS in Switzerland.

h. On or about July 22, 2008, BARNES, LANGLEY and MELTZER caused Houston Refining to wire $1,887,294, which was calculated using a multiplier of 3.75 when the published market rate was 1.86, to a Fossil Energy account at UBS in Switzerland.

i.     On or about October 15, 2008, BARNES, LANGLEY and MELTZER caused a $99,985 wire transfer to be sent from the Dulson Investment account at UBS in Switzerland to BARNES's Wachovia account.

j.     On or about October 31, 2008, BARNES, LANGLEY and MELTZER caused a $100,584 wire transfer to be sent from the Dulson Investment account at UBS in Switzerland to DeBeers in the United States to fund BARNES's purchase of jewelry.

k.     On or about November 10, 2008, BARNES, LANGLEY and MELTZER caused Houston Refining to wire $2,372,039, which was calculated using a multiplier of 2.45 when the published market rate was 1.28, to a Fossil Energy account at UBS in Switzerland.

l.     Between on or about December 12 and 22, 2008, LANGLEY and MELTZER caused the following two wires to be sent from UBS to a Mercedes dealership in Houston for BARNES's purchase of a Mercedes McLaren: a $319,980 wire transfer from the Fossil account and a $199,001 wire transfer from the Dulson Investment account.

m.     On or about January 30, 2009, BARNES, LANGLEY and MELTZER caused Houston Refining to wire $1,603,003, which was calculated using a multiplier of 2.5 when the published market rate was 1.245, to a Fossil account at UBS in Switzerland.

9

n.   On or about June 24, 2009, BARNES, LANGLEY and MELTZER caused a $2,800,000 wire transfer to be sent from the Dulson Investment account at UBS in Switzerland to BARNES's Wachovia account.





All in violation of Title 18, United States Code, Section 1349.

**COUNTS TWO THROUGH FIVE**
**(Wire Fraud)**

A.      INTRODUCTION

1.  The Grand Jury adopts, realleges, and incorporates herein Paragraphs One through Six of the Introduction of Count One as if set out fully herein.

B.      THE SCHEME TO DEFRAUD

2.   From in or about November 2006 and continuing until in or about January 2010, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

**JONATHAN PAUL BARNES,**



**BERNARD LANGLEY,**

**CLYDE MELTZER,**

 and

aiding and abetting each other, knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money by means of material false pretenses, representations, and promises, in that they paid millions of dollars in kickbacks to BARNES so that he would cause Houston Refining to pay inflated amounts for the shipment of crude oil.

C.      MANNER AND MEANS OF THE SCHEME TO DEFRAUD

3. The Grand Jury adopts, realleges, and incorporates, herein the manner and means allegations in Paragraphs Eight through Thirteen of Count One as if set out fully herein.

D.   EXECUTION OF THE SCHEME TO DEFRAUD

4.   On or about the dates set forth below, in the Houston Division of the Southern District of Texas, the defendants listed below, for the purpose of executing the aforementioned scheme and artifice to defraud and to obtain money and property from others by material false and fraudulent representations, pretenses, and promises, did knowingly cause to be submitted by means of wire communication in interstate and foreign commerce the following:

| Count | Date | Defendants | Interstate/Foreign Wire |
|-------|------|-----------|-------------------------|
| 2 | 5/3/07 | JONATHAN PAUL BARNES, BERNARD LANGLEY, CLYDE MELTZER | $1,128,152 wire from Houston Refining account at JP Morgan to Fossil account at UBS in Switzerland |
| 3 | 5/3/07 | JONATHAN PAUL BARNES, BERNARD LANGLEY, CLYDE MELTZER | $773,213 wire from Fossil account at UBS in Switzerland to American Title in Houston |

13

In violation of Title 18, United States Code, Sections 1343 and 2.

### COUNT SIX
(Conspiracy to Commit International Money Laundering▮▮▮▮▮)

A.    INTRODUCTION

1.    The Grand Jury realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs One through Six of Count One of the Indictment.

B.    THE CONSPIRACY AND ITS OBJECT

2.    From in or about November 2006 and continuing until in or about January 2010, in the Houston Division of the Southern District of Texas and elsewhere, the defendants,

### JONATHAN PAUL BARNES,

### BERNARD LANGLEY and

### CLYDE MELTZER,

did knowingly and intentionally conspire, combine, confederate, and agree with each other, with others, known and unknown to the Grand Jury, to transport, transmit, or transfer funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States, knowing that the funds involved in the transmission or transfer represent the proceeds of some form of unlawful activity, and knowing that such

transmission or transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity, that is, wire fraud and commercial bribery under Section 32.43 of the Texas Penal Code, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

C.      MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that:

3.      The Grand Jury realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs Eight through Thirteen of Count One.

4.      When transferring the kickbacks into BARNES's bank accounts held in the United States, LANGLEY and MELTZER would and did typically funnel the kickbacks through a Swiss bank account in the name of Dulson Investments so the money would not be seen as coming directly from the Camac and Fossil accounts to which Houston Refining was sending the inflated payments.

5.      On other occasions, LANGLEY and MELTZER would and did also pay kickbacks to BARNES by wiring money from the Fossil and Dulson Investments accounts held in Switzerland directly to title companies, car dealerships, jewelry stores and other entities from which BARNES was making purchases.

6.      LANGLEY and MELTZER would and did use domestic bank accounts in the name of a Houston-based energy company with which they were associated to

15

receive fraud proceeds from various accounts at the foreign banks where Camac and Fossil were receiving the inflated payments.

7.     LANGLEY and MELTZER would and did transfer fraud proceeds from the Fossil bank account at UBS in Switzerland to the domestic Chase bank account of a Houston sports bar in which BARNES, LANGLEY and MELTZER were investors.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS SEVEN THROUGH TEN
### (International Money Laundering/Concealment)

1.     The Grand Jury realleges and incorporates by reference, as though fully set forth herein, the allegations contained in Paragraphs One and Three through Seven of Count Six of the Indictment.

2.     On or about the dates set forth below in the Southern District of Texas and elsewhere, the defendants,

### JONATHAN PAUL BARNES,

### BERNARD LANGLEY, and

### CLYDE MELTZER,

aided and abetted by each other and others known and unknown to the grand jury, did transmit and transfer the funds described below from a place outside the United States to a place in the United States, knowing that the funds involved in the transmission

or transfer represent the proceeds of some form of unlawful activity, and knowing

that such transmission or transfer was designed in whole or in part to conceal and

disguise the nature, location, source, ownership or control of the proceeds of specified

unlawful activity, that is wire fraud and commercial bribery under Section 32.43 of

the Texas Penal Code.

| COUNT | DATE | DESCRIPTION OF TRANSFER |
|-------|------|--------------------------|
| Seven | 9/21/2007 | $168,789.81 wire transfer from Dulson Investment account at UBS in Switzerland to Mercedes dealership in Houston to fund BARNES's purchase of a vehicle |
| Eight | 10/31/2008 | $100,584 wire transfer from Dulson Investment account at UBS in Switzerland to DeBeers in United States to fund BARNES's purchase of jewelry |
| Nine | 6/3/2009 | $120,000 wire transfer from Fossil account at UBS in Switzerland to bank account at Chase in the United States in the name of a Houston sports bar in which BARNES, LANGLEY and MELTZER were investing |
| Ten | 6/24/2009 | $2,300,000 wire transfer from Dulson Investment account at UBS in Switzerland to a BARNES personal account at Wachovia |

In violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) and 2.

## COUNT ELEVEN
(False Statement in Passport Application)

On or about August 23, 2010, in the Houston Division of the Southern District

of Texas, the defendant,

**JONATHAN PAUL BARNES,**

did wilfully and knowingly make false statements in an application for passport with the intent to induce or secure the issuance of a passport under the authority of the United States for his own use, contrary to the laws regulating the issuance of passports or the rules prescribed pursuant to such laws, in that the applicant falsely stated that his most recent passport was lost and provided a false explanation of how, where and when his passport was supposedly lost.

In violation of Title 18, United States Code, Section 1542.

## COUNT TWELVE
(Bulk Cash Smuggling)

On or about November 12, 2010, in the Houston Division of the Southern District of Texas and elsewhere, the defendant,

## JONATHAN PAUL BARNES,

with the intent to evade a currency reporting requirement, knowingly concealed more than $10,000 in currency in his luggage, and transported such currency from a place outside the United States to a place within the United States.

In violation of Title 31, United States Code, Section 5332.

## NOTICE OF FORFEITURE
### (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United

States Code, Section 981(a)(1)(C), the United States gives notice to defendants,

**JONATHAN PAUL BARNES (Counts 1, 2, 3, 4, 5),**

**BERNARD LANGLEY (Counts 1, 2, 3),**

**CLYDE MELTZER (Counts 1, 2, 3), and**

that in the event of their conviction of any of the offenses charged in Counts One

through Five of this Indictment, all property, real or personal, which constitutes or is

derived from proceeds traceable to such offense, is subject to forfeiture.

## NOTICE OF FORFEITURE
### 18 U.S.C. § 982(a)(1)

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States

gives notice to defendants,

**JONATHAN BARNES (Counts 6, 7, 8, 9 and 10),**

**BERNARD LANGLEY (Counts 6, 7, 8, 9 and 10),**

**CLYDE MELTZER (Counts 6, 7, 8, 9 and 10), and**

that upon conviction of any of the counts Six through Ten, all property, real or personal, involved in money laundering offenses or traceable to such property, is subject to forfeiture.

## NOTICE OF FORFEITURE
### 31 U.S.C. § 5332(b)(2)

Pursuant to Title 31, United States Code, Section 5332(b)(2), the United States gives notice to defendant

### JONATHAN BARNES (Count 12)

that upon conviction of the offense charged in Count Twelve of the Indictment, all property, real or personal, involved in the offenses or traceable to such property, is subject to forfeiture.  Pursuant to 31 U.S.C. § 5332(b)(4), if the property subject to forfeiture is unavailable, and the defendant has insufficient substitute property that may be forfeited in its place, a personal money judgment shall be entered against the defendant for the amount that would be subject to forfeiture under this section.

### Money Judgment

Defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, for which the defendants may be jointly and severally liable, and which is at least $80 million.

## Property Subject to Forfeiture

Defendants are notified that the property subject to forfeiture includes, but is not limited to, the following personal property:

| Asset No. | Asset | Description (including VIN or account number) |
|---|---|---|
| 1 | 2008 Mercedes | WDBSK72F68F139506 |
| 2 | 2008 Mercedes | WDDGF56X48R019081 |
| 3 | 2009 Mercedes | 4JGBF86E99A469213 |
| 4 | 2009 Mercedes | WDDGF56X19R050323 |
| 5 | 2008 Mercedes | WDDAK76FX8M001542 |
| 6 | 2009 Mercedes | WDDNG71X39A275395 |
| 7 | 2009 Mercedes | 4JGBF86E59A499745 |
| 8 | 2009 Mercedes | WDBSK71FX9F154559 |
| 9 | 2009 Mercedes | WDBSK70EX9F158323 |
| 10 | 2009 Bentley | SCBDR33W69C059707 |
| 11 | 1957 Cadillac Brougham once owned by Frank Sinatra | 5770145919 |
| 12 | 2010 Mercedes | WDBSK7AA0BF161160 |
| 13 | 2010 Mercedes | WDDRJ7HA0BA001114 |
| 14 | 2011 Buick Enclave | 5GAKRCED1BJ161225 |
| 15 | Cobalt Boat | FGE30011J910 |
| 16 | Boat Trailer | 45JC1F336A1001010 |
| 17 | Sea Doo Jet Ski | YDV15561D010 |
| 18 | Sea Doo Jet Ski | YDV10508A010 |
| 19 | $1,132,542.63 | Funds seized from Wells Fargo account x2191 on or about August 10, 2010 |
| 20 | $5,000.29 | Funds seized from Wells Fargo account x2201 on or about August 10, 2010 |
| 21 | $1,140,611.10 | Funds seized from Wells Fargo account x2188 on or about August 10, 2010 |
| 22 | $55,030.41 | Funds seized from Wells Fargo account x1395 on or about August 10, 2010 |
| 23 | $6,135,059.13 | Funds seized from Chase account x9328 on or about November 23, 2010 |
| 24 | $163,384.80 | Funds seized from Chase account x6618 on or about November 23, 2010 |
| 25 | Diamond Earrings | Believed to be purchased from DeBeers |
| 26 | Diamond Earrings | Believed to be purchased from DeBeers |
| 27 | Bracelet and necklace | Place of purchase unknown at this time |
| 28 | Silver solitaire ring with round diamond | Believed to be purchased from DeBeers |

| Asset No. | Asset | Description (including VIN or account number) |
|---|---|---|
| 29 | Silver diamond pendant necklace | Believed to be purchased from DeBeers |
| 30 | Square cut yellow diamond "Canary" ring | Believed to be purchased from DeBeers |
| 31 | Gold "Cartier Roadster" watch | Place of purchase unknown at this time |
| 32 | Silver bracelet with colored stones | Believed to be purchased from Valobra |
| 33 | Gold colored bracelet with square design | Place of purchase unknown at this time |
| 34 | Silver & diamond "Pa Ha Cartier" watch | Believed to be purchased from Zadok Jewelers |
| 35 | Twisted silver jewelry | Believed to be purchased from Valobra |
| 36 | Silver diamond and ruby necklace, bracelet & earrings set | Believed to be purchased from Zadok Jewelers |
| 37 | Silver diamond bracelet | Place of purchase unknown at this time |
| 38 | Silver Rolex watch | Place of purchase unknown at this time |
| 39 | Currencies | Various currencies seized from Barnes at the airport on or about November 12, 2010 |

Defendants are further notified that the property subject to forfeiture includes, but is not limited to, property held in the following accounts:

| Asset No. | Bank | Description |
|---|---|---|
| 40 | BNP Paribas (France) | Account believed to be held in the name of Camac International with an account number ending in 2745 |
| 41 | BNP Paribas (France) | Account believed to be held in the name of Camac International with an account number ending 5W31 |
| 42 | | |
| 43 | | |
| 44 | | |
| 45 | | |
| 46 | | |

| Asset No. | Bank | Description |
|---|---|---|
| 47 | ████████████ | ████████████████████████████████ |
| 48 | UBS AG | Account believed to be held in the name of Fossil Energy with an account number ending in 7160 or 160V |
| 49 | UBS AG | Account believed to be held in the name of Camac International with an account number ending in 3598 |
| 50 | UBS AG | Account believed to be held in the name of Camac International with an account number ending in 2598 |
| 51 | UBS AG | Account with an account number ending in 1360 or 360J, name of holder unknown at this time |
| 52 | UBS AG | Account believed to be held in the name of Farid Business, Inc., account number unknown at this time |
| 53 | UBS AG | Account believed to be held in the name of Dulson Investment, account number unknown at this time |
| 54 | UBS AG | Account believed to be held in the name of Jonathan Barnes, account number unknown at this time |

Defendants are further notified that the property subject to forfeiture includes, but is not limited to, the following real property, together with all improvements, buildings, structures and appurtenances:

(1)     real property located in Naples, New York, and more particularly described in that certain deed recorded in the Ontario County Clerk's Office in Liber 1230 of Deeds at Page 487. The record owners are Jonathan Barnes and wife.

(2)     real property located in Naples, New York, and more particularly described in that certain deed recorded in the Ontario County Clerk's Office in Liber 1229 of Deeds at Page 24. The record owners are Jonathan Barnes and wife.

(3)     real property in Bellaire, Texas, which is legally described as follows:

That tract or parcel containing 0.4528 acre of land out of Lot 24,

Block 1 of Westmoreland Farms Amended First Subdivision, a

23

subdivision of record in Volume 3, Page 60 of the Harris County

Map Records, Harris County, Texas, being that same tract of

record under Harris County Clerk's File Number (H.C.C.F. No.)

S339234.

The record owners are Jonathan Barnes and wife.

(4)     real property in Houston, Texas, which is legally described as follows:

Lot One (1) in Block One (1) of Wynden Oaks Estates, an

addition in Harris County, Texas, according to the map or plat

thereof recorded in Film Code No. 365126 of the Map Records of

Harris County, Texas.

## Substitute Assets

Defendants are notified that in the event that property subject to forfeiture, as

a result of any act or omission of defendants,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided

without difficulty,

24

the United States will seek to forfeit any other property of the defendants up to the total value of the property subject to forfeiture pursuant to Title 21, United States Code, Section 853(p), as incorporated by reference in Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1).

A TRUE BILL:

ORIGINAL SIGNATURE ON FILE
FOREPERSON OF THE GRAND JURY

JOSE ANGEL MORENO
United States Attorney

By: Gregg Costa

Gregg Costa
Assistant United States Attorney

25