

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. H-10-787-01-S |
| | § | |
| | § | |
| JONATHAN PAUL BARNES | § | |

## PLEA AGREEMENT

The United States of America, by and through José Angel Moreno, United States Attorney for Southern District of Texas, and Gregg Costa, Assistant United States Attorney; the defendant, Jonathan Paul Barnes; and the defendant's counsel, Rusty Hardin and Derek Hollingsworth, have entered into the following plea agreement (the "Agreement") pursuant to Federal Rules of Criminal Procedure 11(c)(1)(A) and 11(c)(1)(B):

### The Defendant's Agreement

1.      The defendant agrees to plead guilty to Counts One, Six, Eleven and Twelve of the Superseding Indictment. Those counts charge the defendant with the following offenses:

   a.      Count One charges the defendant with knowingly conspiring to commit wire and mail fraud by engaging in a scheme in which he received millions of dollars in kickbacks in exchange for causing his employer to pay grossly inflated amounts for the shipment of oil from Venezuela to a Houston refinery, in violation of 18 U.S.C. § 1349.

b.      Count Six charges the defendant with conspiracy to commit international money laundering in order to conceal the nature and source of fraud proceeds being transferred from Switzerland to the United States, in violation of 18 U.S.C. § 1956(h).

c.      Count Eleven charges the defendant with making a false statement in a passport application, in violation of 18 U.S.C. § 1542.

d.      Count Twelve charges the defendant with bulk cash smuggling into the United States, in violation of 31 U.S.C. § 5332.

By entering this Agreement, the defendant waives any right to have the facts that the law makes essential to the punishment for these offenses either charged in the Superseding Indictment, proved to a jury, or proven beyond a reasonable doubt.

### Punishment Range

2.      The statutory penalty for the four counts to which the defendant is pleading is as follow:

a.      The punishment for the violation of 18 U.S.C. § 1349 in Count One is up to twenty years imprisonment and a fine of up to $250,000.

b.      The punishment for the violation of 18 U.S.C. § 1956(h) in Count Six is up to twenty years imprisonment and a fine of up to $500,000 or twice the value of the laundered funds, whichever is greater.

c.      The punishment for the violation of 18 U.S.C. § 1542 in Count Eleven is up to ten years imprisonment and a fine of up to $250,000.

d.      The punishment for the violation of 31 U.S.C. § 5332 in Count Twelve is up to five years imprisonment and a fine of up to $250,000.

Additionally, for each of these offenses, the defendant may receive a term of supervised release after imprisonment of not more than three years. Title 18 U.S.C. §§ 3559(a) and 3583(b)(2). Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentences, then defendant may be imprisoned for up to two years, without credit for time already served on the term of supervised release prior to such violation. Title 18 U.S.C. §§ 3559(a) and 3583(e)(3). Defendant understands that he cannot have the imposition or execution of the sentences suspended, nor is he eligible for parole.

### Mandatory Special Assessment

3.     Pursuant to 18 U.S.C. § 3013(a)(2)(A), immediately after sentencing, the defendant will pay to the Clerk of the United States District Court a special assessment in the amount of $100.00 per count of conviction. The payment will be by cashier's check or money order payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

### Cooperation

4.     The parties understand that the Agreement carries the potential for a motion for departure pursuant to U.S.S.G. § 5K1.1. The defendant understands and

3

agrees that whether such a motion is filed will be determined solely by the United States. Should the defendant's cooperation, in the sole judgment and discretion of the United States, amount to "substantial assistance," the United States reserves the sole right to file a motion for departure pursuant to U.S.S.G. § 5K1.1. The defendant agrees to persist in his guilty plea through sentencing and to cooperate fully with the United States. The defendant understands and agrees that the United States will request that sentencing be deferred until his cooperation is complete.

5.     The defendant understands and agrees that the term "fully cooperate" as used in this Agreement includes providing all information relating to any criminal activity known to the defendant. The defendant understands that such information includes both state and federal offenses arising therefrom. In that regard:

(a)     The defendant agrees that this Agreement binds only the United States Attorney for the Southern District of Texas and the defendant; it does not bind any other United States Attorney or any other component of the Department of Justice.

(b)     The defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States. The defendant further agrees to waive his Fifth Amendment privilege against self-incrimination for the purpose of this Agreement.

(c)     The defendant agrees to voluntarily attend any interviews and conferences the United States may request.

4

(d)   The defendant agrees to provide truthful, complete, and accurate information and testimony; and he understands that any false statements he makes to the Grand Jury, at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes.

(e)   The defendant agrees to provide to the United States all documents in his possession or under his control relating to all areas of inquiry and investigation.

(f)   Should the recommended departure, if any, not meet the defendant's expectations, the defendant understands that he remains bound by the terms of this Agreement and cannot, for that reason alone, withdraw his plea.

### Waiver of Appeal

6.   The defendant is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. The defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined on any ground set forth in 18 U.S.C. § 3742. Additionally, the defendant is aware that 28 U.S.C. § 2255 affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final.  The defendant waives the right to contest his conviction or sentence by means of any post-conviction proceeding, including but not limited to proceedings authorized by 28 U.S.C. § 2255. If at any time the defendant instructs his attorney to file a notice of appeal on grounds other

than those specified above, the United States will seek specific performance of this provision.

7.     In exchange for this Agreement with the United States, the defendant waives all defenses based on venue, speedy trial under the Constitution and Speedy Trial Act, and the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed, in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates any provision of this Agreement, or (c) the defendant's plea is later withdrawn.

8.     In agreeing to these waivers, the defendant is aware that a sentence has not yet been determined by the Court. The defendant is also aware that any estimate of the possible sentencing range under the *Sentencing Guidelines* that he may have received from his counsel, the United States, or the Probation Office is a prediction, not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office, or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. The defendant further understands and agrees that the *Sentencing Guidelines* are "effectively advisory" to the Court. *United States v. Booker*, 543 U.S. 220 (2005). Accordingly, the defendant understands that, although the Court must consult the *Sentencing Guidelines* and must take them into account when sentencing him, the Court is bound

neither to follow the *Sentencing Guidelines* nor to sentence the defendant within the guideline range calculated by use of the *Sentencing Guidelines*.

9.  The defendant understands and agrees that each and all of his waivers contained in this Agreement are made in exchange for the corresponding concessions and undertakings to which this Agreement binds the United States.

### The United States' Agreements

10.  The United States agrees to each of the following:

(a)  If the defendant pleads guilty to Counts One, Six, Eleven and Twelve of the Superseding Indictment and persists in that plea through sentencing, and if the Court accepts this Agreement, the United States will move to dismiss any remaining Counts of the Superseding Indictment at the time of sentencing.

(b)  At the time of sentencing, the United States agrees not to oppose the defendant's anticipated request to the Court and the United States Probation Office that he receive a two level downward adjustment pursuant to U.S.S.G. § 3E1.1(a) should the defendant accept responsibility as contemplated by the *Sentencing Guidelines*.

(c)  If the defendant qualifies for an adjustment under U.S.S.G. § 3E1.1(a) and his offense level is 16 or greater, the United States agrees to move, pursuant to U.S.S.G. § 3E1.1(b), for an additional one level departure based on the timeliness of the Agreement or the expeditious manner in which the defendant provided complete information regarding his role in the offense.

### The United States' Non-Waiver of Appeal

11.    The United States reserves the right to carry out its responsibilities under the *Sentencing Guidelines*. Specifically, the United States reserves the right:

(a)    to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b)    to set forth or dispute sentencing factors or facts material to sentencing;

(c)    to seek resolution of such factors or facts in conference with the defendant's counsel and the Probation Office;

(d)    to file a pleading relating to these issues, in accordance with U.S.S.G. § 6A1.2 and 18 U.S.C. § 3553(a); and

(e)    to appeal the sentence imposed or the manner in which it was determined.

### Sentence Determination

12.    The defendant is aware that the sentence will be imposed by the Court after consideration of the *Sentencing Guidelines*, which are only advisory, as well as the provisions of 18 U.S.C. § 3553(a). The defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which the defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable *Sentencing Guidelines*. The defendant understands and agrees that the parties' positions regarding the application of the

*Sentencing Guidelines* do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, the defendant cannot, for that reason alone, withdraw a guilty plea, and he will remain bound to fulfill all of his obligations under this Agreement.

## Rights at Trial

13.     The defendant represents to the Court that he is satisfied that his attorney has rendered effective assistance. The defendant understands that by entering into this Agreement, he surrenders certain rights as provided herein. The defendant understands that the rights of a defendant include the following:

(a)     If the defendant persisted in a plea of not guilty to the charges, the defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if the defendant, the United States, and the Court all agree.

(b)     At a trial, the United States would be required to present witnesses and other evidence against the defendant. The defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, the defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for the defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court.

(c)    At a trial, the defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if the defendant desired to do so, he could testify on his own behalf.

### Factual Basis for Guilty Plea

14.    If this case were to proceed to trial, the United States could prove each element of the offenses beyond a reasonable doubt. The following facts, among others, would be offered to establish the defendant's guilt:

### Conspiracy to Commit Wire Fraud/International Money Laundering

a.    A subsidiary of LyondelBasell Industries, Houston Refining LP (Houston Refining), operates a major refinery in Houston. Most of the oil processed at that refinery is shipped from Venezuela. The cost of shipping that crude oil is a major expense. Pricing for crude freight has three components: (1) the amount of crude, typically fixed at 70,000 metric tons; (2) a fixed base rate published on a yearly basis by the World Scale Association that applies to a particular type of vessel and particular route; and (3) a multiplier that takes into account market fluctuations ("market multiplier"), which changes daily and is published by various reporting agencies such as the Association of Ship Brokers and Agents (ASBA). The total price to ship a particular crude freight cargo is calculated by multiplying these three components together. The market multiplier is the only component that fluctuates during the course of a year. Historically, Houston Refining entered into a significant number of shipping contracts that tied the market multiplier to the prevailing published market rates and was otherwise able to obtain pricing that closely tracked market rates. During 2006, for example, Houston Refining's overall cost for shipping crude from Venezuela to its refinery closely tracked the published market rates.

b.    In late 2006, defendant **Barnes** became Marine Charter Manager for Houston Refining. As Marine Chartering Manager, **Barnes** was responsible for entering into contracts for the shipment of the oil being imported from Venezuela.

Houston Refining's accounting department had a procedure in place to verify that the invoices sent for shipping matched the contracted terms, but did not analyze whether the contract itself was negotiated at market rates. During fall 2009, new management at Houston Refining noticed that the shipping costs seemed excessive. Subsequent analysis of the shipping during **Barnes**'s tenure as Chartering Manager revealed that with respect to three entities **Barnes** was negotiating with that had not previously done business with Houston Refining, the pricing was approximately $82 million above published market rates. During that same time period, when **Barnes** contracted for shipping with entities Houston Refining had used in the past, the prices were much closer to published market pricing. Also, after **Barnes** learned of the internal investigation around November 2009, he suddenly renegotiated pricing with the three new entities and those revised prices closely tracked market pricing.

c.    Federal investigation revealed that **Barnes** was agreeing to the grossly inflated prices with these three entities because they were paying him millions of dollars in kickbacks.   Codefendants Bernard Langley and Clyde Meltzer used two entities, Camac International Ltd. and Fossil Energy Resources Ltd., to submit the inflated billings.   Langley and Meltzer worked for the Camac Group when the kickback scheme began.  They initially used an actual Camac bank account to receive the proceeds, which required Meltzer and Langley to submit to Camac's accounting department invoices from **Barnes** falsely stating that brokering services performed by "IFO Energy Services" required payment to **Barnes**'s UBS bank account, when Meltzer and Langley knew the invoices were just a vehicle to provide kickbacks to **Barnes**. Langley and Meltzer then set up an account at UBS using the name Camac but that they controlled.  By 2008, Langley and Meltzer were exclusively using Fossil, which Langley incorporated in the British Virgin Islands, for the kickback scheme.  One example from July 2008 illustrates the above-market pricing terms **Barnes** agreed to with those who were paying him kickbacks.  **Barnes** caused Houston Refining to send a $1,887,294 international wire transfer to a Fossil account at UBS in Switzerland based on an invoice using a market multiplier of 3.75, which was double the 1.86 published market rate.

d.    **Barnes** knew Meltzer from the early 1990s, when they had entered into a similar kickback arrangement when **Barnes** worked for Enron and Meltzer worked for Glencore.  Around the time Barnes became Marine Chartering Manager for Houston refining, **Barnes** encountered Meltzer in Houston and they devised a plan for doing a kickback scheme in which Barnes would arrange shipping with entities

at inflated prices in exchange for receiving a third of the profits as kickbacks. Meltzer introduced **Barnes** to a longtime business associate of his, Bernard Langley, who handled most of the accounting for the scheme. Meltzer and Langley split the profit remaining after paying the kickbacks to **Barnes**.

e.   From 2007 through 2009, **Barnes** agreed to pricing with Camac and Fossil that resulted in charges for shipment of oil that were more than $50 million above published market prices. This was achieved by entering into fixed-price contracts that provided for pricing substantially above market pricing. Indeed, for every single month prior to fall 2009 when Houston Refining began investigating the pricing, the prices Barnes agreed to with Camac and Fossil were above market pricing. In addition, even though many of the contracts contained standard provisions allowing for termination upon certain dates, **Barnes** did not cancel the above-market contracts and enter into new agreements because of the bribes he was receiving. During 2009, **Barnes** entered into a similar kickback arrangement with another entity and other conspirators, while he continued to use Fossil for some shipping.

f.    Langley and Meltzer paid approximately $20 million in kickbacks to **Barnes** during the time when Barnes was arranging shipping through Camac and Fossil at inflated prices. **Barnes**, Meltzer and Langley concealed these kickbacks from Houston Refining, which paid invoices from Camac and Fossil based on the false pretense that the prices were the product of arms-length negotiation when in fact they were set at above-market levels because of the corrupt payments Meltzer and Langley were making to **Barnes**. Camac and Fossil directed that Houston Refining pay their invoices by sending international wire transfers to accounts in their names at UBS in Switzerland.

g.   In an attempt to conceal the kickbacks, Langley and Meltzer never sent money directly from the Camac or Fossil UBS accounts to **Barnes** in the United States. Instead, when kickbacks were being sent to bank accounts Barnes maintained in the United States, Langley and Meltzer used a separate account at UBS in the name of Dulson Investments. Langley also incorporated Dulson in the British Virgin Islands, using the same registered agent he used for Fossil. More than $5 million was wired from the Dulson UBS account in Switzerland to accounts **Barnes** controlled at Wachovia in the United States, including a $2.8 million wire sent from the Dulson UBS account to **Barnes**'s Wachovia account on June 24, 2009. Other kickbacks were also sent to a personal **Barnes** account at UBS and an account **Barnes** maintained at

UBS in the name of "Farid Business." Langley and Meltzer wired millions of dollars in additional kickbacks from the Dulson or Fossil UBS accounts in Switzerland directly to title companies, car dealers, jewelry stores and other businesses in the United States selling items to **Barnes**, who gave some of these items to friends and family in whose names the items were registered. Meltzer and Langley also paid kickbacks to **Barnes** in the form of investments in other businesses Meltzer and Langley controlled. On another occasion, Meltzer and Langley paid **Barnes** a kickback in the form of a joint investment the three conspirators made in a Washington Avenue sports bar.

### False Statement in Passport Application

h.     On August 10, 2010, a United States Postal Inspector served numerous seizure warrants on **Barnes** for automobiles, jewelry and other items that constituted proceeds of the fraud. That morning, the Inspector asked **Barnes** for his passport, explaining that if he provided it the government would then be willing to sit down with **Barnes**, discuss the evidence against him, and give him a chance to cooperate. In response, **Barnes** turned over his passport.

i.     On or about November 9, 2010, the Postal Inspector obtained information from Customs showing foreign travel for a number of targets in this investigation, including **Barnes**. That information showed that **Barnes** had engaged in foreign travel to Mexico, Switzerland, Hong Kong and London since providing his passport to law enforcement. Further investigation revealed that **Barnes** applied for a new passport on August 23, 2010. In that application **Barnes** stated that he had lost his passport and provided a false story about how during the spring of 2010 he had thrown out a briefcase that contained the passport, when in fact he knew that he had provided the passport to law enforcement just a couple weeks earlier.

### Bulk Cash Smuggling

j.     On November 12, 2010, **Barnes** was arrested on a passport fraud charge when his flight from Frankfurt landed at Bush Intercontinental Airport in Houston (he had traveled to Montenegro and caught a connecting flight in Frankfurt). In response to the Customs Declaration form's question asking whether **Barnes** was bringing $10,000 or more in U.S. currency or foreign equivalent into the United States, **Barnes** marked "No." In fact, **Barnes** had currency, including U.S. dollars, Swiss francs,

Euro and currency from Hong Kong and Cuba, valued at more than $50,000 in his luggage. This money was proceeds of the kickback fraud.

### Breach of Plea Agreement

15.    If the defendant fails in any way to fulfill completely all of his obligations under this Agreement, the United States will be released from its obligations hereunder, and the defendant's plea and sentence will stand.  If at any time the defendant retains, conceals, or disposes of assets in violation of this Agreement, or if the defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may ask the Court to set aside his guilty plea and reinstate prosecution.  Any information and documents that have been disclosed by the defendant, whether prior to or subsequent to execution of this Agreement, and all leads derived therefrom, will be used against the defendant in any prosecution.

### Restitution, Forfeiture and Fines

16.    This plea agreement is being entered into by the United States on the basis of Defendant's express representation that Defendant will make a full and complete disclosure of all assets over which Defendant exercises direct or indirect control, or in which Defendant has any financial interest.

14

17.     Defendant agrees to make complete financial disclosure to the United States by truthfully executing a sworn financial statement (Form OBD-500 or similar form) by the deadline set by the United States, or if no deadline is set, no later than sentencing.   Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms for the United States to obtain tax information, bank account records, credit history, and social security information. Defendant agrees to discuss or answer any questions by the United States relating to the Defendant's complete financial disclosure.

18.     Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines, including, but not limited to, surrendering title, executing a warranty deed, signing a consent decree, stipulating to facts regarding the transfer of title and basis for the forfeiture, and signing any other documents necessary to effectuate such transfer.   Defendant also agrees to direct any banks which have custody of Defendant's assets to deliver all funds and records of such assets to the United States.

**Restitution**

19.     Defendant agrees to pay full restitution to the victim regardless of the count(s) of conviction. Defendant stipulates and agrees that as a result of his criminal

conduct the victim incurred a monetary loss of $82 million. Defendant understands

the Court will determine the amount of full restitution to compensate all victims.

Defendant will not attempt to avoid or delay payment.

### Forfeiture and Money Judgment

20.     Defendant admits that he and his co-conspirators obtained approximately

$82 million in proceeds of the conspiracy to defraud. Defendant did not personally

receive all of that money, which was shared among the co-conspirators. Defendant

understands that he is liable for the full amount of fraud proceeds and that the United

States will request that the Court make the liability joint and several among any

convicted co-defendants.

21.     Defendant stipulates and agrees that the factual basis for his guilty plea

supports the forfeiture of $82 million. Defendant agrees to a personal money

judgment for $82 million against him and in favor of the United States of America.

Defendant stipulates and admits that one or more of the conditions set forth in 21

U.S.C. § 853(p) exists. Defendant agrees to forfeit any of Defendant's property, or

Defendant's interest in any property, up to the value of any unpaid portion of the

money judgment, until the money judgment is fully satisfied.

22.     Defendant agrees to forfeit whatever interest Defendant has in assets

obtained with or traceable to proceeds of the conspiracy to defraud, or assets involved

in the conspiracy to commit international money laundering. In particular, Defendant stipulates and agrees that all of the property listed in the notice of forfeiture in the superseding indictment, or in the supplements to the notice of forfeiture, are subject to forfeiture. Specifically, Defendant admits and agrees that each of Items 1-39, 48-50, 52-54, 61 and 68, as well as real property assets (1) - (4), constitute fraud proceeds or are traceable to fraud proceeds. In addition, Defendant admits that the assets purchased with wire transfers from the Fossil and Dulson accounts at UBS, and those accounts themselves, are property involved in money laundering.

23.    Defendant agrees to waive any and all interest in any asset which is the subject of any related administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. With respect to the civil forfeiture actions pending in the Southern District of Texas involving real property assets (1), (2) and (4), after entry of the guilty plea, Defendant will agree to a final judgment forfeiting those properties. With respect to the civil forfeiture action pending in the Southern District of Texas involving real property asset (3) which is Defendant's residence, Defendant will agree to a final judgment forfeiting that property at his sentencing hearing.

24.    Defendant consents to the order of forfeiture becoming final as to the Defendant immediately following this guilty plea pursuant to Fed.R.Crim.P. 32.2(b)(4)(A), except for the real property listed in paragraph (3) of the forfeiture

notice in the Superseding Indictment, which will both become final as to the Defendant at sentencing.

25.     Defendant waives the right to challenge the forfeiture of property, in any manner, including by direct appeal or in a collateral proceeding.

## Fines

26.     Defendant understands that under the *United States Sentencing Commission Guidelines Manual* (hereafter referred to as "*Sentencing Guidelines*" or "U.S.S.G."), the Court is permitted to order the defendant to pay a fine that is sufficient to reimburse the United States for the costs of any imprisonment or term of supervised release, if any is ordered.

## Complete Agreement

27.     This Agreement, consisting of nineteen pages constitutes the complete plea agreement between the United States, the defendant, and his counsel. No promises or representations have been made by the United States except as set forth in writing in this Agreement. The defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

28.     Any modification of this Agreement must be in writing and signed by all parties.

Filed at Houston, Texas, on March 11, 2011.


_____
Jonathan Paul Barnes
Defendant

Subscribed and sworn to before me on March 11 , 2011.

DAVID BRADLEY, Clerk
UNITED STATES DISTRICT CLERK


By: _____
Deputy United States District Clerk

APPROVED:

JOSE ANGEL MORENO
United States Attorney

By: _____    _____
Gregg Costa                      Rusty Hardin
Assistant United States Attorney  Derek Hollingsworth
                                  Attorneys for Defendant

19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. H-10-787-01-S |
| | § | |
| JONATHAN PAUL BARNES | § | |

## ADDENDUM TO PLEA AGREEMENT

I have fully explained to the defendant his rights with respect to the pending Superseding Indictment. I have reviewed the provisions of the *United States Sentencing Commission Guidelines Manual*, and I have fully and carefully explained to the defendant the provisions thereof which may apply in this case. I have also explained to the defendant that the *Sentencing Guidelines* are only advisory and the Court may sentence the defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of the Agreement with the defendant. To my knowledge, the defendant's decision to enter into the Agreement is an informed and voluntary one.

_____          March 11, 2011
Attorney                                                 Date

I have consulted with my attorney and fully understand all my rights with respect to the Superseding Indictment pending against me.  My attorney has fully explained and I understand all my rights with respect to the provisions of the *United States Sentencing Commission Guidelines Manual* which may apply in my case.  I have read and carefully reviewed every part of the Agreement with my attorney.  I understand the Agreement, and I voluntarily agree to its terms.

_____        _____
Defendant                                                                    Date

2